IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **WILBERT JOHNSON,** | * |
|     **Plaintiff,** | * |
| **v.** | *     Case No.: DLB-21-547 |
| **STACIE MAST,** *et al.*, | * |
|     **Defendants.** | * |

**MEMORANDUM OPINION**

Wilbert Johnson, who is incarcerated at a Maryland state prison, alleges that he was provided inadequate medical care for a hand injury he sustained while he was housed at North Branch Correctional Institute ("NBCI"). In a verified complaint, Johnson, who is self-represented, asserts claims against NBCI medical staff, Stacie Mast, R.N., Holly Hoover, N.P. (formerly Holly Pierce), and Krista Self, N.P. (formerly Krista Bilak). ECF 1. Construed liberally, his complaint asserts a claim under 42 U.S.C. § 1983 for deliberate indifference to his medical needs in violation of the Eighth Amendment and state law claims of negligence and medical malpractice. *Id*. Defendants filed a motion to dismiss, or in the alternative, for summary judgment. ECF 24. The Court informed Johnson he had a right to file a response to defendants' motion, ECF 25, but none has been filed. For the reasons discussed below, the Court treats the motion as one for summary judgment and grants summary judgment as to the § 1983 claim against Mast, Hoover, and Self. To the extent that Johnson intended to state a § 1983 claim against Wexford Health Services ("Wexford"), the company that provides medical services to Maryland inmates, that claim is dismissed without prejudice. Finally, the Court declines to exercise supplemental jurisdiction over any state law claims.

I.   **Factual Background**

The following facts are taken from the verified complaint and Johnson's medical records. On May 5, 2018, Johnson injured his hand during a fight with another NBCI inmate and sought treatment from Stacie Mast, R.N. at the nurse's station. ECF 1-1, at 3 (verified compl.); ECF 24-4, at 2 (med. recs.). According to his medical records, Johnson complained of pain in his right hand from punching the other inmate, but he moved and opened his hand without any difficulty and there were no open areas or cuts. ECF 24-4, at 2. He asked to have pepper spray washed out of his eyes, and he was returned to custody. *Id*. According to Johnson, his hand was "in excruciating pain, swollen and reddish coloring" during that visit. ECF 1-1, at 3.

On May 6, 2018, Johnson made a sick call request for the pain in his hand. ECF 24-4, at 3. The request was received the next day and signed by a provider on May 8, 2018. *Id*. Johnson made additional sick call requests for his hand on May 17 and 18. *Id*. at 6–7.[1]

Johnson was seen on May 25, 2018. ECF 24-4, at 8. Tammy Buser, R.N., noted that Johnson's hand was swollen and painful between the thumb and pointer finger. *Id*. She ordered an X-ray. *Id*. The X-ray was performed on June 5, 2018, and the radiologist diagnosed Johnson with an "acute fracture involving distal head of second metacarpal bone with mild displacement." *Id*. at 11. The report also stated that "there is no evidence of joint dislocation or subluxation. Phalanges and carpal bones are intact." *Id*.

---

[1] Defendants claim notes from May 7 and July 17 provider visits with Holly Hoover, CRNP show Johnson waited two weeks to report his hand injury. ECF 24-3, at 2, 4. They do not. Hoover reported on May 7 that Johnson "stated he was fine and had no issues," and she reported on July 17 that he stated "he waited 2 weeks before he placed a sick call because he thought it would get better." *Id.* (citing ECF 24-4, at 4, 21) (emphasis from defs' mem. removed). Johnson's statements in the May 7 report, which is titled "Behavioral Health Segregation Visit," appear to be in response to questions regarding his mental—not physical—health, and defendants' own exhibits show that Johnson did not wait two weeks to report his hand injury. *See* ECF 24-4, at 3, 4, 6-7.

Three days later, defendant Krista Self, N.P. saw Johnson for a provider visit. ECF 24-4, at 12. She found minimal swelling and tenderness at the joint. *Id*. She splinted his hand in an ace bandage and explained that the "[l]ength of time since injury [was] too great for any further repair." *Id*. However, she stated that she would "consult plastics for [a] second opinion" and track the healing process through an additional X-ray in two weeks. *Id*. An X-ray was ordered for June 22, 2018, with a provider referral after the second X-ray. *Id*. The record does not indicate that Self consulted "plastics."[2]

Johnson placed a sick call on June 10, 2018, complaining that the ace bandage made his hand pain worse and that the pain was still excruciating. ECF 24-4, at 14. He saw Mast three days later, and she noted that he had "no active complaints of pain" and that the June 8 provider's note stated "the injury was to[o] far out to have further repair done." *Id*. at 16. Johnson requested additional pain medication and to be "sent out for repair," stating that he was told he would be referred to an outside specialist. *Id*. Mast noted that Johnson argued, became irritated, and left the exam room when she told him that there was nothing more to be done about his hand. *Id*. The same day, Johnson put in another sick call regarding his hand. *Id.* at 15. He stated that he only had seen a nurse who did not help, that he needed to see a doctor, and specifically, that he needed outside treatment. *Id*. He noted Self had mentioned "calling the orthopedic." *Id.*

On June 16, 2018, Johnson saw Mast again and repeated his request for a referral to a specialist. ECF 24-4, at 18. Mast unwrapped his hand and found no swelling or discoloration. *Id*. She noted that while he would not move the fingers in his right hand on command, he "move[d] them when not thinking about it." *Id*. She referred him to a provider for follow-up. *Id*. at 19.

---

[2] "Plastics" may refer to orthopedics. Regardless, no referral to a specialist was ordered.

On June 19, 2018, Johnson's hand was X-rayed again. ECF 24-4, at 20. The X-ray showed "subacute to chronic fracture of the distal second metacarpal bone with mild persistent displacement and deformity." *Id*.

On July 17, 2018, Johnson saw defendant Holly Hoover, CRNP to review his June 19 X-ray results. ECF 24-4, at 21. She found tenderness at the joint and stated that a "request [was] placed to email X-rays to [orthopedic surgeon Ashok] Krishkaswamy [M.D.] for recommendation." *Id*. She ordered another two-week follow-up with a provider. *Id*. at 22. The record does not reflect that the X-rays were sent to Dr. Krishkaswamy or that the provider follow-up visit occurred.

On September 1, 2018, Dr. Getachew noted in Johnson's medical record: "I was asked to generate a consult for this patient to have orthopedic follow-up. I reviewed his electronic health record and noted that he had mild persistent displaced deformity of his second metacarpal bone. I submitted consult for orthopedic follow-up. I have not seen or examined the patient." ECF 24-4, at 27. On the same day, Dr. Getachew submitted the consult for orthopedic surgery. *Id*. at 28.

On October 16, 2018, Johnson had a telehealth visit with Dr. Krishkaswamy. ECF 24-4, at 30–34. The doctor found "slight tenderness of the distal portion of the right 2nd metacarpal with angulated deformity" and "tenderness on grip strength." *Id*. at 32. He advised that new X-rays should be taken and recommended a follow-up after the X-rays to determine whether there was still displacement and angulation. *Id.* He stated that, if so, an osteotomy of the bone with plate fixation and cast application could be necessary. *Id*. An October 21 X-ray showed that there was "no evidence of an acute fracture, dislocation or subluxation," that the "[p]halanges and carpal bones [we]re intact," and "[a]lignment [wa]s anatomical." ECF 1-13, at 2. The impression was

"no acute osseous abnormality." *Id*. There is no evidence of a follow-up appointment with Dr. Krishkaswamy.

The next medical record regarding Johnson's hand injury is a March 2, 2019 note documenting a visit with Hoover, during which Johnson stated he still was having pain and decreased range of motion in his hand and requested additional Tegretol. ECF 24-4, at 49. Hoover stated that a "repeat XRAY of the right hand was unremarkable. Assessment of right hand is unremarkable with normal ROM. Will continue ibuprofen for discomfort. Orthopedic consult not indicated at this time. Tegretol not indicated at this time. Patient unhappy with treatment plan." *Id*.

## II.   Standard of Review

Defendants move to dismiss the complaint for failure to state a claim or alternatively for summary judgment. The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). When the parties present and the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

In their motion, defendants stated they sought summary judgment and attached Johnson's medical records and a declaration from Holly Hoover, CRNP. All of this alerted Johnson to the fact that he could present relevant evidence in support of his position and in response to the defendants' evidence. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). The motion, memorandum, and exhibits were served on him. ECF 24, at 2. Moreover, the Court sent notice to Johnson advising him that defendants' motion could be construed as one

for summary judgment and could result in the entry of judgment against him.  ECF 25.  Thus, the Court is satisfied that plaintiff has been advised that defendants' motion could be treated as one for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motion.  The Court will resolve the motion under Rule 56.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position.  Fed. R. Civ. P. 56(c)(1)(A).  Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[3]  A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment.  *Id.* at 251.  The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249).  However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper.  *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most

---

[3] Johnson's verified complaint is based on personal knowledge and therefore "is the equivalent of an opposing affidavit for summary judgment purposes." *See Carter v. Fleming*, 879 F.3d 132, 141 n.8 (4th Cir. 2018) (quoting *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## III. Defendants Mast, Self, and Hoover

Section 1983 provides a federal cause of action for any individual who believes a person acting under color of state law has deprived him or her of a constitutional right. *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707 (1999). Under the Eight Amendment, the government must "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Any "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To prevail on his constitutional claim based on the alleged inadequate provision of medical care, Johnson must establish that defendants' actions or their failure to act amounted to "deliberate indifference to serious medical needs." *See id.* at 106; *see also Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021); *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). He must show that "his medical condition was objectively serious—that is, 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hixson*, 1 F.4th at 302 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). Johnson also must demonstrate that the official subjectively knew of and disregarded an excessive risk to the inmate's health or safety. *Id.* "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). An inmate can show subjective knowledge "through direct evidence of actual knowledge or through circumstantial

7

evidence," such as evidence that "'the risk was obvious.'" *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

"Deliberate indifference is a very high standard." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one). "[T]he treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303 (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)). It requires "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). Deliberate indifference will not be found if "prison officials [who] are aware of a serious medical need . . . "respond[ ] reasonably to the risk." *Id.* at 302 (quoting *Farmer*, 511 U.S. at 844). Thus, "'[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." *Id.* at 302–03 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

A delay in medical care violates the Eighth Amendment if, objectively, it put the inmate "at a 'substantial risk' of 'serious harm'" and "the defendants 'subjectively recognized' that there was such a risk and that their 'actions were inappropriate in light of that risk.'" *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (quoting *Scinto*, 841 F.3d at 225, and then *Anderson*, 877 F.3d at 545); *see Smith v. Smith*, 589 F.3d 736, 738–39 (4th Cir. 2009) ("mere delay . . . can be sufficient to constitute a violation of the Eighth Amendment" if "'the prison official acted with a sufficiently culpable state of mind and . . . [that] the deprivation suffered or injury inflicted on the inmate was sufficiently serious.'" (quoting *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008)). A delay causes substantial harm if the result is "a 'marked' exacerbation of the prisoner's medical condition or

8

'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citing *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)); *see also McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.").

The issue here is whether NCBI medical staff Mast, Self, and Hoover were deliberately indifferent to Johnson's fractured hand, which undisputedly is a serious medical need. In his verified complaint, Johnson contends that the defendants provided inadequate treatment to him, falsified their documentation, denied him medication, and delayed his access to treatment. ECF 1, at 2. He does not provide any other evidence to support his claim. Defendants argue the medical records show that they did not deliberately deny him necessary medical treatment or medication and that they provided him with constitutionally adequate care. ECF 24-3, at 14. Defendants contend that Johnson's "disagree[ment] with the treatment he was provided" does not establish a violation of the Eight Amendment. *Id*. at 17. After a careful review of the record, the Court finds no evidentiary support for Johnson's claims that Mast, Self, and Hoover were deliberately indifferent to his medical needs.

Mast, a registered nurse, saw Johnson on May 5, 2018, the day he was injured. He told her that his hand hurt "from punching the other inmate," but his "only complaint was to have pepper spray washed out of eyes." ECF 24-4, at 2. She noted that he was opening and closing his hand without difficulty and that there were no open cuts or wounds. Regardless whether his hand was swollen and red on that date, as Johnson states, the record reflects that Mast examined his hand, noted he was taking Tegretol and ibuprofen, and reasonably found that no further treatment was necessary. *Id*.; *see* ECF 24-5, ¶ 6 (Hoover "opinion to a reasonable degree of nurse practitioner

practice" that, "given [Mast's] assessment[,] there was no indication for any additional treatment at that time").

Mast saw Johnson two more times, over a month later. On June 13, she saw him again and he asked for a stronger pain medication and a referral to a specialist. ECF 24-4, at 16. Mast noted that he "was able to move all upper and lower extremities without difficulty" and "climbed on exam table without any difficulty." She also noted that his hand was wrapped, he had prescriptions for ibuprofen and Tegretol, and the June 8 provider's note stated "the injury was to[o] far out to have further repair done." *Id*. The plan was to follow up with a provider in two weeks. *Id*. On June 16, Johnson asked Mast again to refer him for treatment. ECF 24-4, at 18. When she examined him, he refused to move the fingers on his right hand, yet he "move[d] them when not thinking about it." *Id*. She found no swelling or discoloration. *Id*. She referred him to a provider for further evaluation and medication. *Id*.

The record evidence shows that Mast examined Johnson's hand each time she saw him, ensured he was receiving pain medication, and referred him to a provider. There is no record evidence to support a conclusion that Mast knew of and disregarded an excessive risk that her treatment and recommendations on May 5 and in early June would exacerbate Johnson's injury or prolong his pain. Therefore, there is no evidence that she was deliberately indifferent to his injury. *See Hixson*, 1 F.4th at 302.

Self saw Johnson for the first and only time on June 8, following his initial X-ray, which showed an acute fracture. She noted tenderness and minimal swelling in his hand but more than a month had passed since he injured his hand and she believed the "[l]ength of time since injury [was] too great for any further repair." ECF 24-4, at 12. She splinted his hand, renewed his pain medication prescriptions, and stated that she would "consult plastics" for a second opinion. *Id*. at

12–13; ECF 1-1, at 4.  There is no evidence that Self consulted with anyone about Johnson's injury after his visit, and Johnson was not referred to a specialist at that time.  ECF 1-1, at 4.  However, there is no evidence that Self's failure to consult a specialist either exacerbated Johnson's injury or prolonged his pain.  Even if there were such evidence, there is no evidence that Self knew that failing to consult a specialist would create an excessive risk to his health.  The only relevant evidence before the Court on this issue is Hoover's uncontested declaration in which she, a Certified Registered Nurse Practitioner who reviewed Johnson's medical records, opines there was no indication for additional treatment when Self saw Johnson.  ECF 24-5, ¶ 7.  There is no evidence that Self was deliberately indifferent to Johnson's injury.  *See Hixson*, 1 F.4th at 302.

Johnson's allegation that Hoover was deliberately indifferent to his serious medical needs likewise is unsupported by the record.  Hoover saw Johnson on July 17, 2018, following his second X-ray.  ECF 24-4 at 21.  She reviewed the X-rays, observed tenderness at the joint, and requested that the X-rays be emailed to Dr. Krishnaswamy for recommendations.  *Id*.  She also ordered a follow-up with a provider in two weeks.  *Id*. at 22.  There is no record of any email to Dr. Krishnaswamy, orthopedic consult request, or two-week follow-up, which appears to be why Johnson claims Hoover lied about submitting a referral.  *See* ECF 1, at 7.  However, there is no evidence that it was Hoover's responsibility to send the emails and schedule the follow-up appointment.  Nor is there evidence that any oversight on her part occurred with an awareness of and disregard for an excessive risk that Johnson's injury would be exacerbated or his pain would be prolonged.

Hoover saw Johnson again on March 2, 2019, and he again requested outside treatment and additional pain medication.  ECF 24-4, at 49.   Hoover told him that the most recent X-ray showed his injury had healed and therefore no additional pain medication or orthopedic

appointments were indicated. *Id*. There is no evidence that Hoover knew that not providing additional pain medication or referring Johnson to orthopedics on that date would exacerbate his injury or prolong his pain. In fact, at that point, there was no evidence that Johnson was still suffering from a serious injury, as the evidence shows his hand had healed. In her uncontested declaration, Hoover opines that there was no medical indication for the treatment Johnson requested. ECF 24-5, ¶ 10. Mere "'[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." *Hixson*, 1 F.4th at 302–03 (quoting *Wright*, 766 F.2d at 849). There is no evidence of exceptional circumstances in this case.

Viewing the evidence in the light most favorable to Johnson, the Court still concludes that Mast, Self, and Hoover are entitled to summary judgment on Johnson's § 1983 claim. There is no evidence that they were deliberately indifferent to his serious medical needs. As such, summary judgment is granted in their favor on the § 1983 claim.

## IV.   Defendant Wexford

Johnson named Wexford as a defendant in the caption of his complaint, but he did not make any specific allegations against it. ECF 1.

A private corporation that acts on behalf of a state actor, such as Wexford, may be found liable on what is called a "*Monell*" claim under limited circumstances. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipal liability under § 1983); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (liability of a private corporation under § 1983). To state a *Monell* claim, the plaintiff must "identify a . . . 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). An entity "may not be held liable under § 1983 solely because it employs a tortfeasor," and the Court will

not impose liability "under a theory of *respondeat superior*." *Id.* (citing *Monell*, 436 U.S. at 694); *see Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

Johnson has not alleged that Wexford had a policy or custom that caused him harm. Therefore, any § 1983 claim against Wexford is dismissed.

## V.   Conclusion

For the foregoing reasons, the Court grants defendants Mast, Self and Hoover's motion for summary judgment as to the § 1983 claim. To the extent that plaintiff intended to bring a § 1983 claim against Wexford, the claim is dismissed without prejudice. Having "dismissed all claims over which it has original jurisdiction," the Court declines to exercise supplemental jurisdiction over any state law claims. 28 U.S.C. § 1367(c)(3). A separate order follows.

August 9, 2022
Date

Deborah L. Boardman
United States District Judge